# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1070 | **DATE** | 8/29/2000 |
| **CASE TITLE** | Enesco Corporation vs. K's Merchandise Mart, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. K's motion for summary judgment (Doc. 27-1) is denied. With respect to the Lanham Act claim, the denial is without prejudice to a renewed motion when both sides agree that discovery is complete.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | AUG 3 0 2000 | | 56 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | NW docketing deputy initials | | |
| | Mail AO 450 form. | | 8/29/2000 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| ETV | courtroom deputy's initials | ED-7 FILED FOR DOCKETING 00 AUG 29 PM 5: 37 | ETV mailing deputy initials | | |
| | | Date/time received in central Clerk's Office | | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

AUG 3 0 2000

ENESCO CORPORATION,           )
                             )
        Plaintiff,            )
                             )
    v.                        )    No. 99 C 1070
                             )
K'S MERCHANDISE MART, INC.,   )    Judge Rebecca R. Pallmeyer
                             )
        Defendant.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Enesco Corporation ("Enesco"), an Illinois corporation, filed suit against K's Merchandise Mart, Inc. ("K's"), an Ohio corporation, charging K's with unauthorized sales of Enesco's products. Enesco's complaint includes three counts: (i) tortious interference with contractual relations; (ii) tortious interference with prospective economic advantage; and (iii) unfair competition under the Lanham Act, 15 U.S.C. §1125(a). This court has jurisdiction over the Lanham Act claim pursuant to 28 U.S.C. §§1331 and 1338 and supplemental jurisdiction over the pending state law tortious interference claims. Defendant has filed a motion for summary judgment as to all three counts of the complaint. For the following reasons, the motion is denied.

## I.    Background

Enesco creates and markets quality, branded gifts, collectibles, and decorative accent products that are sold to consumers throughout the United States. (Pltf.'s Rule 56.1(b) Statement ¶ 5; Comp. ¶4.) Enesco's product lines include porcelain bisque collectible figurines sold under the "Precious Moments" trademark and figurines sold under the

50

"Cherished Teddies" trademark (collectively, "PM/CT Figurines"). (Pltf.'s Rule 56.1(b) Statement ¶6; Comp. ¶5.) These product lines have a sizeable following of collectors who are knowledgeable about PM/CT Figurines and who not only buy the products, but participate in collectible shows, dealer events and other promotional activities. (Pltf.'s Rule 56.1(b) Statement ¶80-81; Ghosn Decl., at ¶3.) Enesco licenses the right to manufacture, distribute, import and export products using the Precious Moments designs and artwork from Precious Moments, Inc. (License Agreement between Precious Moments, Inc., and Enesco Corporation, p. 3, Defendant's Exhibit 4.) The licensing agreement between Enesco and Precious Moments, Inc., signed in January 1999, includes a "Transshipment Policy" which states:

> The parties agree that during the term of the Agreement, they shall maintain the mutually agreed upon procedures, as set forth in Exhibit A attached hereto or as subsequently amended, to endeavor to prevent the [un]authorized transshipment of Licensed Products into the United States. Subject to compliance with the applicable foreign law, Enesco further agrees that it shall enter into contractual agreements with its foreign subsidiaries, its foreign affiliates and its foreign sub-licensees that will expressly preclude them from exporting Licensed Products to the United States.

(Defendant's Rule 56.1(a) Statement ¶13-14; License Agreement Between Precious Moments, Inc. and Enesco Corporation ["PMI License"].) Exhibit A referred to in this paragraph is entitled "Policy." Its stated purpose is to ensure that "the Enesco Corporation will not tolerate transshipping of Precious Moments Porcelain Bisque products." It also lists steps Enesco will take "to minimize the incidence of transshipping," including maintaining and updating agreements for every Precious Moments authorized dealer. *Id.*

Enesco sells PM/CT Figurines only to its roughly 30,000 authorized dealers, who have entered into Authorized Dealer Agreements ("Agreements") with Enesco and who sell the figurines at the retail level. (Pltf.'s Rule 56.1(b) Statement ¶¶ 7, 8, 9; Comp. ¶¶6, 7; Enesco Group, Inc. 1998 Form 10K.) The Agreements set out guidelines for advertising, display and sale of both PM and CT Figurines. (Pltf.'s Rule 56.1(b) Statement ¶9; Comp. ¶6; Schimpf Decl.) Both PM and CT Figurine Agreements include an anti-transshipment clause which states that figurines may only be sold under the store name and at the location listed on the Agreement unless otherwise approved by Enesco. Dealers may not "transfer or transship, for resale or further distribution, [PM/CT Figurines] to any location nor act as an agent for third parties in the sale of [PM/CT Figurines] without specific, written approval from Enesco." (1996, 1997, 1998, and 1999 Cherished Teddies Authorized Retailer Agreements; 1995, 1996, 1997, 1998, and1999 Precious Moments Authorized Dealer Agreements.) The Agreements for both product lines state that "subject to the basic responsibilities described [in this Agreement], both Enesco and [authorized dealers] are free to pursue their individual best interest at all times." *Id.* The Agreements were for the duration of one year and terminated on the last day of the calendar year. A violation of the terms of the Agreement resulted in the loss of authorized dealer status. *Id.*

K's is not now nor has it ever been an authorized dealer of PM/CT Figurines. (Pltf.'s Rule 56.1(b) Statement ¶15; Exhibit C, Baker Dep., at 40; Comp. ¶9.) K's buyer of Special Collectibles, Dorothy Baker, testified that Enesco "would never sell [PM/CT Figurines] to [K's]" because K's was not an authorized dealer. *Id.*

3

Despite the fact that K's has never purchased or received figurines from Enesco, K's does stock and sell PM/CT Figurines at its stores. (Def.'s Rule 56.1(a) Statement ¶41; Baker Dep., at p. 10-11.) K's purchases the figurines from at least three suppliers: Collector's Resource Market ("CRM"), Karen-Leslie Company ("KL"), and Porceram, Inc. ("Porceram"). (Baker Dep., at p. 10-11.) As the buyer, Baker monitors the store inventory and calls one or all of her suppliers when the inventory is low. (Baker Dep., at p. 25-26.) Baker testified that if a particular product is selling well, she will request more of that figurine from her suppliers. (Baker Dep., at p. 27.) She said that the suppliers also send lists of available products to her from time to time because they know she wants the list of what is available. (Baker Dep., at p. 24.)

K's contends that none of its three suppliers of PM/CT Figurines is an authorized dealer of PM/CT Figurines and these dealers therefore have no contractual relationship with Enesco. (Defendant's Rule 56.1(a) Statement ¶25; Ouellette Dep., at p. 39.) Enesco contends that at least one of those suppliers, CRM, is merely a front for Maxine's, Ltd., a store in Des Moines, Iowa, which was an authorized dealer for many years. (Plaintiff's Rule 56.1(b) Statement ¶9; Davis Transcript, at p. 10-13, 24; Keiser Decl. at ¶8.) Max Rosenberg manages the day-to-day operations of Maxine's, which is owned by his mother. *Id.* at 9-13. His responsibilities include the ordering and purchasing of PM/CT Figurines. He stated that he has, on behalf of Maxine's, signed some of the annual authorized dealer agreements with Enesco. *Id.* at 32. Rick Davis, identified as the owner and operator of CRM, is actually a business alias for Rosenberg. (Davis Transcript, at p. 12-13.) Rosenberg/Davis operates CRM

from a mail forwarding center in Indiana and his home in Iowa. (Davis Transcript, at p. 38-42.) He testified that CRM sells approximately 98% of its figurines to K's although it also supplies KL with PM/CT Figurines. *Id.* at 15, 26. Rosenberg/Davis testified that he receives PM/CT Figurines from Moishe Liquidators, which is run by a man named Moishe whom he has dealt with for years. Although Rosenberg/Davis had seen Moishe within 60 days prior to his deposition, he was unable to provide identifying information such as an address or telephone number. *Id.* at 55-57. Rosenberg/Davis was able to describe Moishe's physical appearance only in vague terms and could not identify Moishe's accent although he testified that Moishe speaks with one. *Id.* at 113-14. Rosenberg/Davis testified that Moishe delivered the figurines to the Maxine's store in Des Moines. *Id.* at 46.

Rosenberg/Davis also testified that CRM's second supplier was Maxine's itself, which received its PM/CT Figurines directly from Enesco when it was an authorized dealer. Rosenberg/Davis explained that he would take figurines that he had ordered for Maxine's and ship them to K's. *Id.* at 24. Rosenberg/Davis stated that Maxine's "unknowingly" supplied CRM with PM/CT Figurines, by which he meant that his mother, the principal of Maxine's, did not know that he was transshipping the PM/CT Figurines. *Id.* at 24, 27. In letters signed by David A. Mourhess, director of operations, Enesco terminated Maxine's Agreement for PM Figurines in 1995 and its Agreement for CT Figurines in 1998 because Enesco alleged that Maxine's was buying and selling PM/CT Figurines to and from outside sources in violation of the anti-transshipment clause. (Letter from Enesco's to Maxine's of 6/16/95; Letter from Enesco's to Maxine's of 6/23/98.)

Based on a list that KL produced of its own suppliers of PM/CT Figurines, Enesco identified two authorized dealers who shipped PM/CT Figurines to KL in violation of the Agreement's anti-transshipment clause. (Keiser Decl., at ¶2-4; Compilation of Karen-Leslie Co., Inc. Purchase of Cherished Teddy's Figurines.) K's contends that none of its suppliers ever revealed its source of PM/CT Figurines to K's, nor did K's at any time inquire as to the sources. (Def.'s Rule 56.1(a) Statement ¶ 30, 34, 38; Baker Dep., at p. 17, 65-66.)

Enesco notes the evidence that K's officers were aware of contractual restrictions prohibiting K's purchase of Enesco products. Dan Ouellette, K's Vice President of Merchandising, acknowledged that he was aware of some sort of contractual relationship between Enesco and its authorized dealers that may have included an exclusive sale agreement although he had never seen it in writing. (Ouellette Dep., at p. 37-47.) Ouellette was also aware that Enesco's authorized dealers were prohibited from transshipping PT/CT Figurines, although, again, he had never seen this requirement in writing.

Dorothy Baker had also heard that Enesco sold PM/CT Figurines only to authorized dealers and that it had written agreements with these dealers. (Baker Dep. at p. 39, 44.) She was also aware that the authorized dealers were prohibited under the agreement from selling to others who intended to sell to a third party. (Baker Dep., at p. 46.) Baker testified that she didn't try to find additional suppliers of PM figurines (other than K's three suppliers) because "I would not know where to look." The Precious Moments suppliers "don't advertise the fact. They don't go to shows." (Baker Dep., at p. 22.) According to Baker, this

6

behavior is unlike that of suppliers for other products, who exhibit at trade shows and have sales representatives call on her. *Id.*

Baker had never personally met any of the people she dealt with at the three companies that supplied PM/CT Figurines to K's. She stated that she was sure Rick Davis would not tell her where he conducted business if she asked because "the less I know the better off I am." *Id.* at 35. Baker never asked any of K's suppliers where they obtained their PM/CT Figurines because "(a)s long as they are supplying me with the product, I don't need to know." *Id.* at 17.

A fax dated July 1, 1998, from Rick Davis to Baker states that "(w)e now have more information on the PM and CT show exclusives . . . girl standing with a [sic] open umbrella retail $70.00 this item is allocated K's order 144 . . . The following PM is now retired #307009 Victorian girl Charity. We can increase your orders on the show specials and place a [sic] order on the retired PM." (Fax from Collector's Resource Market dated 7/1/98.) Enesco contends that this fax establishes that Baker actively sought "exclusive showpieces," which are one type of "special status" figurines.

On or about March 30, 1998, Baker received a letter in the mail from Enesco addressed to "Dear Valued Enesco Customer and Independent Sales Representative." (Baker Dep. at 49, Letter from Enesco dated 3/30/98.) The letter stated that Enesco had taken steps to insure its products were not being sold at unauthorized locations and that more steps were being taken to prevent future unauthorized sales. *Id.* It explained that Enesco's Agreements with authorized dealers include a "long-standing contractual prohibition against unauthorized

transshipment and sales." *Id.* The letter also clearly stated that Enesco products must be sold only by current authorized dealers that have acquired their products from Enesco for resale. *Id.* The letter warned that any participation in unauthorized "transshipment" would result in termination of the parties' Agreement and possibly a lawsuit. *Id.* Finally, the letter established a thirty-day amnesty period for any party to comply with the Agreement and for past or present authorized dealers and sales representatives to come forward without reprisal. *Id.* No copy of the Agreement was included in or attached to the letter. After receipt of this letter, which Baker testified she might have copied and sent to Ouellette, K's continued to acquire PM/CT Figurines from its suppliers and sell those figurines in its stores. (Baker Dep., at p. 49.) Baker did not discuss the letter with Ouellette or anyone else at K's, nor did she make any change in K's purchasing practices. *Id.* at 51.

The parties debate whether customers could be or were confused about K's status as an authorized dealer because of its sale of PM/CT Figurines. Robert Schimpf, an independent sales representative for Enesco, testified that he visited two K's stores in Indiana, where he observed display techniques that he felt gave the impression that K's is an authorized dealer. Schimpf conceded, however, that authorized dealers display PM/CT Figurines in many ways and there is no way to objectively ascertain from a display whether or not a store is an authorized dealer. (Schimpf. Dep., at 152.). K's sold the PM/CT Figurines in one section of its store consistent with both general marketing practices and with the manner in which authorized dealers display PM/CT Figurines. Schimpf stated that the figurines were displayed in an area of the store designated for "collectibles." It is undisputed

that K's has sold "special status" figurines, which are specially prepared figurines that Enesco claims enter the stream of commerce in a controlled fashion only to top authorized dealers in order to promote their collectibility. (Pltf.'s Statement of Additional Facts ¶22; Schimpf Decl. ¶10.) K's uses in-store signage, with the figurine logo, to draw attention to the PM/CT Figurines and the fact that they are being sold at a discount. (Schimpf Dep., at 176-180.) According to K's, an authorized dealer does not sell PM/CT Figurines at a discount and therefore the signage would indicate to a knowledgeable PM/CT Figurine collectors that K's was not an authorized dealer. (Def.'s 56.1(a) Statement ¶¶61, 62, 83; Schimpf Dep., at 146-147, 159.) Enesco points out, however, that J.C. Penney's, a former authorized dealer, sold PM/CT Figurines at a discount when liquidating Penney's inventory of the figurines. (Pltf.'s Statement of Additional Facts ¶18; Schimpf Dep., at 70-72.)

Schimpf did not observe the decals or other signage in the two K's stores he visited, nor did he see the product literature that an authorized dealer would ordinarily have available to hand out to customers. (Def.'s Rule 56.1(a) Statement; Schimpf Dep., at 186.) K's has displayed the PM/CT trademarks in its advertising, however, and also uses the trademarked, stylized version of Enesco's company name. (Def.'s Response to Pltf.'s Additional Facts, ¶¶17, 20; Schimpf Decl. ¶8; K's 1998 Home Shopping Guide at p. 101.) The advertisements show PM/CT Figurines at a reduced price as well as discounts on other products. (Pltf.'s Rule 56.1(b) Statement; Def.'s Rule 56.1(a) Statement, Ex. 15.)

Shirley Hake ("Hake"), a sales assistant for the last six years at Anne's Hallmark retail store, located near a K's store in Fort Wayne, Indiana, testified that based on customers'

questions, she believes many think K's is an authorized dealer. "For example, I specifically remember one customer insisting that K's Merchandise Mart 'just had' to be an authorized dealer, since K's offered for sale special Precious Moments figurines that the customer was sure were only available through authorized dealers." (Hake Decl. ¶3.)[1]

Enesco contends that it has suffered a decrease in sales to many of its authorized dealers that are in the vicinity of a K's department store location. (Pltf.'s Statement of Additional Facts ¶14; Keiser Decl. ¶¶6, 7.) For instance, an authorized dealer near the K's location in Rockford, Illinois, suffered a net decrease in PM/CT Figurine purchases of approximately $6,000 in the first quarter of 2000 compared with the first quarter of 1999. Enesco's PM Figurines overall sales actually increased in the first quarter of 2000, however. (Enesco's Securities and Exchange Commission Form 10-Q, at p. 12-13.) K's points to other factors that might explain the decrease in sales figures, including an industry-wide trend to move away from traditional collectible sales. (Def.'s Response to Pltf.'s Statement of Additional Facts ¶14; Enesco's Annual Report for 1999, at p. 20.)

## II.   Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories and admissions of file together with the affidavits, if any, show that there is

---

[1]    K's has objected to Ms. Hake's testimony as hearsay. (Def.'s Reply to Pltf.'s Statement of Additional Facts ¶15.) The court overrules this objection as Hake's testimony is not being offered as evidence of the truth of the matter asserted: "that K's Merchandise Mart 'just had' to be an authorized dealer." FED. R. EVID. 801(c). K's concedes that it is not an authorized dealer.

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Flores v. Preferred Tech. Group*, 182 F.3d 512, 514 (7th Cir.1999). In determining the existence of material facts, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Flores*, 182 F.3d at 514. An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Carter v. American Oil Co.*, 139 F.3d 1158, 1161 (7th Cir.1998). The party that bears the burden of proof on a particular issue at trial may not rest on the pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III. Discussion

Enesco alleges that K's actions described above constitute (i) tortious interference with contractual relations; (ii) tortious interference with prospective economic advantage; and (iii) unfair competition under the Lanham Act, 15 U.S.C. §1125(a). K's asserts that no genuine issue of material fact exists and it is therefore entitled to summary judgment as to all three counts.

### A.   Preemption Under the Copyright Act

K's maintains that Enesco's state law tortious interference claims are preempted by 17 U.S.C. §301(a) of the Copyright Act. Although the court declined to accept an amicus curiae brief that Porceram submitted, it will briefly address the arguments included in that brief as K's has adopted them in its motion for summary judgment.

11

Section 301(a) of the Copyright Act preempts Enesco's state law claims if the Act itself protects the rights asserted under the state law. The Seventh Circuit has established a two-pronged test to determine if a state law claim is preempted. First, the goods must be tangible and protected by the Copyright Act. "Second, the court must find that the state right is equivalent to any of the rights specified in the federal copyright law." *Goes Lithography Co. v. Banta Corp.*, 26 F. Supp. 2d 1042, 1047-48 (N.D. Ill. 1998) (*citing Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.*, 805 F.2d 663, 674 (7th Cir. 1986), *cert. denied*, 480 U.S. 941, 107 S. Ct. 1593 (1987). To avoid preemption under the Act, the state claim must require an additional element that is qualitatively different from those necessary for copyright infringement. 17 U.S.C.A. § 301(b)(3) (section does not limit common law rights regarding "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106").

It is uncontested that the PM/CT Figurines are tangible works that enjoy protection under the Copyright Act. Under the second prong of the test, however, K's has failed to establish that the conduct or activity Enesco seeks to enjoin could be addressed in an infringement action under § 106 the Copyright Act. *Baltimore Orioles*, 805 F.2d at 676. Rather, Enesco is seeking to enforce a state common law contractual right and prevent transshipment of the PM/CT Figurines. This is "qualitatively different" from a copyright infringement claim. Preemption is appropriate in cases where the sale of goods is premised on misrepresentation of the authorship of the goods. *See LaCour v. Time Warner Inc.*, No. 99 C 7105, 2000 WL 688946, *6 (N.D. Ill. May 24, 2000). The tortious interference claims

here do not implicate the authorship of the PM/CT Figurines as there is no question that K's sells genuine PM/CT Figurines. The tortious interference state law claims are therefore not preempted by the Copyright Act.

## B. Tortious Interference with Contractual Relations

To prove a tortious interference with contractual relations claim, Enesco must establish the following five elements: (1) The existence of a valid and enforceable contract between Enesco and its authorized dealers; (2) K's awareness of this contract; (3) K's intentional and unjustified inducement of a breach of the contract; (4) the subsequent breach by the authorized dealers; and (5) damages. *See HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154-55, 545 N.E.2d 672, 676 (1989).

Neither party disputes that a valid contract between Enesco and its authorized dealers exists. K's maintains, however, that authorized dealers are not prohibited under the contract from selling to non-authorized dealers; that K's did not know about the contractual relationship Enesco had with its authorized dealers; that K's did not induce a breach of the contract between Enesco and its authorized dealers because it purchased PM/CT Figurines from third-party suppliers and not authorized dealers; and that its actions as a competitor in the market were privileged. The court addresses these arguments in turn.

### 1. Valid and Enforceable Contract

K's first contention is that the anti-transshipment contract provision in question relates solely to the importation of PM/CT Figurines from outside the United States and simply does not prohibit authorized dealers from reselling PM/CT Figurines purchased from

a United States authorized dealer. It bases this interpretation on the provision in the License Agreement between Precious Moments, Inc. and Enesco that states that "Enesco further agrees that it shall enter into contractual agreements with its foreign subsidiaries, its foreign affiliates and its foreign sub-licensees that will expressly preclude them from exporting Licensed Products to the United States." K's also points to subsequent amendments to the Licensing Agreement that discuss imports and exports from international affiliates. K's reads this language together with the provision in the authorized dealer Agreement that each party to the contract is "free to pursue their individual best interest at all times," and concludes that the transshipping provision simply does not apply to the transshipment of PM/CT Figurines that were not imported into the United States.

Enesco responds that K's ignores other language in the License Agreement between Precious Moments, Inc. and Enesco, language that indicates that the transshipment provision applies to foreign and domestic authorized dealers. It also points out that K's claim that the parties to the contract are free to pursue their best interests ignores the language in this provision that the right is "subject to the basic responsibilities described above [in the contract]."

The court need only look to this extrinsic evidence for aid in interpreting the contract if the contract language at issue is ambiguous. *Henderson v. Roadway Express*, 308 Ill. App. 3d 546, 548, 720 N.E.2d 1108, 1110 (4th Dist. 1999). If not, "(t)he intent of the parties must be determined from the plain and ordinary meaning of the language of the contract." *Id.* The provision that is actually at issue, included in the PM authorized dealer Agreements from

1995 through 1999, states that the authorized dealer agrees not to "transfer or transship, for resale or further distribution, [PM/CT Figurines] to any location nor act as an agent for third parties in the sale of [PM/CT Figurines] without specific, written approval from Enesco." This language is unambiguous and the court must give it its ordinary meaning: the authorized dealers agreed not to transfer PM/CT Figurines to any location for resale. Nothing in this provision limits the transshipping or transferring provision only to imported product from foreign dealers. K's argument that the Agreement simply does not apply to this situation therefore fails.

## 2.    Awareness of the Contract

K's next maintains that Enesco cannot establish that K's was aware of the contract and its terms because it "was never told of the 'fact and substance' of any contractual relationship between Enesco and its authorized dealers." Both Ouellette's and Baker's testimonies cast a long shadow of doubt on this assertion. They stated that they were aware that Enesco had a contractual relationship with its authorized dealers that included an exclusive sale agreement in some form. (Ouellette Dep. at 39-47; Baker Dep. at 39-40.) K's long-standing awareness of the Agreement is further evidenced by Baker's testimony regarding her unsuccessful attempt to purchase PM/CT Figurines directly from Enesco and her statement that, as a result of this attempt, Baker knew Enesco only sold to authorized dealers

Baker also admitted that she received the letter dated March 30, 1998, in which Enesco stated that it had a "long-standing contractual prohibition against unauthorized transshipment and sales" and that it had taken steps to insure its products were not being sold at

unauthorized locations. This establishes that K's was put on notice of the existence of the contract and its specific terms sometime in April 1998 when Baker received the letter. *See D56, Inc. v. Berry's, Inc.*, 955 F. Supp. 908 (N.D. Ill. 1997) (receipt of letter from manufacturer through which defendant learned details of the plaintiff's authorization sales contracts put it on notice of contract and its terms). The fact that Baker did not discuss the letter or implement any change in purchasing policy in light of the information received also fortifies Enesco's contention that K's was already aware of the specifics of the anti-transshipment clause. K's cites no cases in its motion that support its assertion that it is required to have seen and read the contract before it can be found to have notice of the contract. Drawing all inferences in Enesco's favor, the court finds that a genuine issue of material fact exists as to whether K's had knowledge of the contract and its terms.

### 3.    Inducement of a Breach of the Contract

K's asserts that Enesco cannot prove that K's induced a breach of the authorized dealer Agreement because K's suppliers were not authorized dealers. Enesco responds that Maxine's, an authorized dealer during at least some of the time it dealt with K's, and CRM, one of K's suppliers, are in effect the same entity. Rosenberg/Davis manages the day-to-day operations of Maxine's, including the ordering and purchasing of PM/CT Figurines. He has signed some of the annual authorized dealer agreements with Enesco on behalf of Maxine's. Rosenberg/Davis testified that he took product purchased from Enesco for Maxine's and transferred it to CRM, where 98% of the time CRM sold it to K's. Considering Rosenberg/Davis' level of responsibility at Maxine's, especially his authorization to sign

authorized dealer Agreements, the court finds that his conclusory assertion that Maxine's never knowingly supplied figurines to K's does not resolve the issue. His testimony creates a genuine issue of material fact as to whether CRM was no more than a front through which Maxine's transshipped PM/CT Figurines to K's.

K's argues that even if CRM is somehow connected to Maxine's, there is no evidence that K's knew this was the case. Baker's testimony regarding what she knew about K's suppliers, however, raises a question of fact on this issue as well. Baker stated that she did not ask her suppliers where they received their product because she was "better off not knowing." She also testified that unlike suppliers of other products, PM/CT Figurine suppliers "don't advertise the fact. They don't go to shows." She stated that she was sure Rick Davis would not tell her where he conducted business if she asked because "the less I know the better off I am." Coupled with Baker's stated knowledge that Enesco sold PM/CT Figurines only to authorized dealers, who were subjected to resale restrictions, this testimony raises a question for the jury as to the extent of K's knowledge concerning whether its suppliers were actually authorized dealers. In addition, Enesco points out that K's simply cites no case law or other support for its argument that buying from middlemen somehow insulates it from liability.

K's further contends, however, that even if its suppliers were authorized dealers, its actions do not constitute inducement of a breach of the Agreement with Enesco. Inducement "'requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way.'" *In re the Estate of Albergo*, 275 Ill. App. 3d 439, 446, 656 N.E.2d 97, 103 (2nd Dist. 1995) (quoting M. Polelle & B. Ottley, ILLINOIS TORT LAW,

17

at 334 (1985)). K's claims that "passive acceptance of the benefits of a breach of contract is not" equal to intentional inducement of a breach. *Continental Assurance Co. v. Davis*, 21 F. Supp.2d 838, 843 (N.D. Ill. 1998).

The question, then, is whether K's simply passively accepted benefits of any breach of the Agreement. Baker testified that K's had a business relationship with the named suppliers that included regular requests for goods on her part. She stated that if a particular figurine was selling well, she would request more of that specific piece from one or all of her suppliers. The record also indicates that Baker wanted the suppliers, including CRM, to notify her of what PM/CT Figurines were available for purchase. Enesco also contends that the fax Rosenberg/Davis sent to Baker establishes that K's seeks out "exclusive showpieces," which are one type of "special status" figurine. K's denies that the fax establishes that it made the request because Rosenberg/Davis sent the information to Baker, not vice versa. The fax does suggest, however, that K's supplier was aware of K's desire for that specific figurine.

In *Davis*, which K's cites as support, a husband learned after his wife's death that she had removed him and substituted her sister as the named beneficiary of the wife's life insurance policy. *Id.* at 841. The husband sued the sister for tortious interference with contractual relations. There was no allegation in *Davis*, however, that the sister ever intentionally induced the wife to change the beneficiary, but only that she knew her sister had made the change. *Id.* at 843. That situation is distinguishable from the instant case, where K's is alleged to have had an ongoing relationship with its suppliers and solicited sales of PM/CT Figurines despite its admitted knowledge that an authorized dealer Agreement

18

restricting resale existed.[2] By providing a regular outlet for goods and for soliciting sales from suppliers it may have known were breaching a contract, K's could be found to have encouraged the continued violation of the anti-transshipment clause in the authorized dealers' Agreement with Enesco. "If a jury concludes that defendants knew that the authorized dealers were prohibited from transshipping the Collections and finds the evidence that defendants solicited sales from the Doe Companies is credible, it can reasonably conclude that defendants intentionally induced the Companies." *D56, Inc. v. Berry's Inc.*, 955 F. Supp. 908, 916-917 (N.D. Ill. 1997). A genuine issue of material fact therefore exists as to whether K's induced a breach of the authorized dealer Agreement.

### 4. Privilege

K's next maintains that as a competitor, it was privileged to interfere with Enesco's relationships with its authorized dealers. *See Lynchval Systems, Inc. v. Chicago Consulting Actuaries, Inc.*, 49 U.S.P.Q.2d 1606 (N.D. Ill. 1998) (competitor privileged to interfere with business relationship with a third party unless it acts with malice or wrongful intent).

---

[2]     The only other cases K's cites to support its claim that it did not induce a breach are two Florida Appellate Court cases. Besides being non-binding on this court, the facts in those cases are so dissimilar that they are of little assistance. *See Rosa v. Florida Coast Bank*, 484 So.2d 57, 58 (Fla. Ct. App. 1986) (when selling business to third party, plaintiff relied on bank's statement of terms for third party's assumption of plaintiff's mortgage; bank's reneging on promise constituted breach of contract to plaintiff but not intentional interference with plaintiff's contract with third party); *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1223 (Fla. Ct. App. 1980) (president of debtor corporation could not establish that its creditor committed tort of malicious interference with contractual relationship between president and financier where creditor did no more than solicit bids for more favorable reorganization from other organizations).

Because no evidence of malice or wrongful intent exists, according to K's, it is entitled to summary judgment on this defense.

K's is correct that "(c)ourts will recognize a privilege in intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *HPI Health Care Services*, 131 Ill. 2d at 157, 545 N.E.2d at 677. "The privilege to engage in business and to compete allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App.3d 606, 615, 663 N.E.2d 1, 7 (1st Dist. 1995). However, "(t)hat privilege extends to the tort of interference with a prospective business relation or economic advantage but does not apply to the tort of interference with a contractual relation." *Id.* (citing *Galinski v. Kessler*, 134 Ill. App.3d 602, 610, 480 N.E.2d 1176, 1182 (1st Dist. 1985) ("[u]nlike the right to receive the benefits of a contract, the right to engage in a business relationship is not absolute, and must be exercised with regard to the rights of others")). K's affirmative defense that its conduct was privileged because it was acting as a competitor is therefore inapplicable to Enesco's claim for tortious interference with contractual relations.

5.     **Damages**

In its motion for summary judgment, K's does not address whether Enesco has established that it was damaged by K's alleged actions. Enesco points out in its response only that it has developed evidence of several breaches of the Agreements along with resultant

damages. It submitted the declaration of John Keiser, Senior Vice President, Sales, to establish that Enesco has terminated the Agreements of authorized dealers that supplied K's with PM/CT Figurines because the dealer violated the anti-transshipment clause. Keiser also named several dealers in the vicinity of K's stores that have experienced a decline in PM/CT Figurines purchases from Enesco. In its reply, K's insists for the first time that any damages Enesco has alleged occurred are fanciful because (1) Enesco received the contract price for the PM/CT Figurines at the initial sale, (2) any decreased sales figures it offers are the result of an industry-wide trend away from traditional sales, (3) Enesco's sales actually increased in the first quarter of 2000, and (4) Keiser's declaration has not been supplemented by actual sales figures.

K's first argument, that Enesco received its contract price in the original sale, fails because the basis for Enesco's claim for damages is that K's actions resulted in a shift in sales from its authorized dealers to K's, resulting in reduced sales from Enesco to several authorized dealers and presumably the corresponding loss of good will created by the exclusive sales agreement. *See D56*, 955 F. Supp. at 918. Keiser's declaration did include specific sales losses for several authorized dealers in the vicinity of a K's store. K's claim that Enesco's overall sales actually increased in 2000 is nonresponsive to Enesco's claim that specific stores located near a K's store have experienced a decrease in sales. Indeed, the fact that Enesco's overall sales increased arguably bolsters the contention that the drop in sales at stores near K's locations is attributable to the competition from K's. Further, K's contention that the drop in sales specific stores are experiencing is simply the result of an industry-wide

trend is simply an interpretation of the facts that must be left to a jury. For these reasons, the court finds that K's has not established that there is no genuine issue of material fact that Enesco has not suffered damages.

## C. Tortious Interference with Prospective Economic Advantage

To prove a tortious interference with prospective economic advantage claim, Enesco must establish the following four elements: (1) a reasonable expectancy of a valid business relationship; (2) K's knowledge of that expectancy; (3) K's intentional or malicious interference with the expectancy that induces a breach; and (4) damages. *Callis, Papa, Jensen, Jackstadt & Halloran, P.C. v. Norfolk Southern Corp.*, 292 Ill. App. 3d 1003, 1010, 686 N.E.2d 750, 755 (5th Dist. 1997) (quoting *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511-12, 568 N.E.2d 870, 877-78 (1991)). Enesco contends that the evidence supporting this claim is the same as that for the claim for tortious interference with contractual relations and that this should yield the same outcome on the motion for summary judgment. K's contends that an action for tortious interference with contractual relations precludes a claim for tortious interference with prospective economic advantage and that Enesco cannot maintain both counts as to one contract. *See e.g., Delphi Industries, Inc. v. Stroh Brewery Co.*, 945 F.2d 215, 219 (7th Cir. 1991) (claim for interference with prospective economic advantage "does not allow recovery for breach of the continuing performance of an existing contract").[3] Because

---

[3]     Although K's failed to raise this argument in its motion to dismiss or its motion for summary judgment, instead waiting until its reply to the motion for summary judgment, the court will address the issue because it permitted Enesco to file a sur-reply to the motion
(continued...)

interference with contractual relations requires plaintiff to establish an *existing* contract and interference with prospective economic advantage requires proof of an expectancy of a *future* business relationship, K's claims that Enesco cannot maintain both causes of action based on alleged breaches of its authorized dealer Agreements.

An examination of Enesco's complaint, however, indicates that it is not basing both of its tort claims on the alleged breach of the Agreement itself. Rather, Enesco alleged in paragraph 22 of the complaint that its prospective economic advantage claim is based on the fact that Enesco "expected to continue its authorized dealer relationships with the [authorized dealers who breached the anti-transshipment provision], under which [these dealers] would continue to purchase Enesco's Special Collectibles and resell them at retail to consumers as authorized dealers." The Agreement itself addresses the authorized dealer's responsibilities, including the duty not to transship, but does not obligate the authorized dealer to purchase a specified number of figurines during the term of the Agreement. Enesco's damages as to the prospective economic advantage claim are based on the loss of future sales to these dealers and K's interference with this expectancy because Enesco forgoes these sales when it is forced to terminate the authorized dealer Agreements of dealers who violate the anti-transshipment clause. *D56, Inc. v. Berry's Inc.*, No. 95 C 592, 1996 WL 252557, * 7 (N.D. Ill. May 10, 1996) (in denying motion to dismiss, court found that plaintiff had pleaded that "there are essentially two separate agreements, one not to transship the good to other retailers (for

---

[3](...continued)
for summary judgment.

which plaintiff granted the retailer the status of an 'authorized dealer'), and one for the purchase of the Collections"). Enesco's two tort claims are not based on the same contract and, thus, one does not preclude the other.

The factual issues supporting the tortious interference with a prospective economic advantage claim, such as whether K's purchased PM/CT Figurines from an authorized dealer and whether Enesco terminated that dealer's Agreement based on this breach of the transshipment provision, are in dispute. As the court indicated above, Enesco has established a question of fact as to whether Maxine's and CRM are the same entity. It also established that it terminated Maxine's authorized dealer Agreement because it alleged the store had violated the anti-transshipment provision. Because K's raised the affirmative defense of privilege as to both tortious interference claims in its answer to the complaint, the court will give K's the benefit of the doubt that it intended to raise it as to both claims in its motion for summary judgment as well. Illinois has adopted the approach of the RESTATEMENT (SECOND) OF TORTS §768 to determine what constitutes lawful competition in tortious interference cases. *Galinski v. Kessler*, 134 Ill. App. 3d 602, 480 N.E.2d 1176 (1st Dist. 1985). The RESTATEMENT states:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if:
> (a) the relation concerns the matter involved in the competition between the actor and the other; and
> (b) the actor does not employ wrongful means; and
> (c) his action does not create or continue in an unlawful restraint of trade; and

24

(d) his purpose is at least in part to advance his interest in competing with the other.

The privilege clearly requires the parties to be in competition with one another. K's has not offered any evidence that it was in competition with Enesco. K's is not a manufacturer and distributor of gifts, collectibles and decorative accent products but is instead a seller of those items. Thus, K's competes with Enesco's authorized dealers but not directly with Enesco. The privilege of competition simply does not apply to the circumstances here. For all of these reasons, the motion for summary judgment as to the tortious interference with prospective economic advantage is denied.

### D.    The Lanham Act

Enesco's final claim is for unfair competition under the Lanham Act, 15 U.S.C. §1125(a)(1). It alleges that K's actions have given consumers the false impression that K's is an authorized dealer and is somehow affiliated with or sponsored by Enesco.

K's argues that this claim must fail because under the "first sale doctrine," Enesco cannot restrict sales of its products following their sale to authorized dealers. Under this doctrine, "[o]nce a trademark owner sells his product, the buyer may resell the product under the original mark without incurring any trademark liability." *NEC Electronics, Inc. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987). K's claims that Enesco cannot "prevent or control the sale of goods bearing the mark once [it] has permitted those goods to enter commerce." RESTATEMENT (THIRD) OF UNFAIR COMPETITION §24 cmt. b. It maintains that the mere stocking, displaying, and reselling of a product has been held to be permissible

under the Lanham Act, even if resale causes some customer confusion. *Sebastian International, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir. 1995). The Supreme Court recently reaffirmed the "first sale" doctrine in *Quality King Distributors, Inc. v. L'Anza Research International, Inc.*, 523 U.S. 135 (1998). *Quality King* was a copyright case, but the doctrine limits all three prinicipal forms of intellectual property rights, including trademark rights. *Allison v. Vintage Sports Plaques,* 136 F.3d 144, 1448 (11th Cir. 1998). In *Enesco v. Price/Costco, Inc.*, 146 F.3d 1083 (9th Cir. 1998), the court recognized the application of the "first sale" doctrine to the sale of the figurines at issue in this case, but concluded it did not bar an action against a retailer which had repackaged the figurines in allegedly inferior packaging. 146 F.3d at 1085-86.

In its ruling on the motion to dismiss, this court noted a distinction between creating confusion incidental to permissible resale and accompanying advertisement of trademarked products, on the one hand, and creating confusion by conduct beyond mere resale on the other. Such conduct might include some type of active or purposeful deception, false suggestion, or misrepresentation on the part of a reseller, designed or likely to cause confusion about whether or not the reseller is an authorized dealer. K's motion argues that Enesco's evidence of deception is insufficient.

The evidence Enesco relies on to forestall summary judgment on its Lanham Act claim is slim. Enesco emphasizes K's inclusion of both of the PM/CT Figurine trademarked logos as well as the trademarked version of Enesco's name in its advertisements and store signage, K's store displays, and its sale of figurines that are available only to a select group of

authorized dealers. According to Enesco, this conduct goes beyond mere stocking, resale and advertisement of its products and is together "designed or likely to cause confusion" about whether or not K's is an authorized dealer. The court is skeptical that K's stocking of select figurines is evidence of deceptive conduct. Presumably any successful retailer is eager to stock desirable products.

Enesco points out at least one instance, however, in which the use of a trademarked logo in advertising has been held sufficient to support a claim for unfair competition. *Bandag Inc. v. Al Bolser Tire Stores, Inc.*, 750 F.2d 903, 911 (Fed. Cir. 1984) (although defendant was entitled to advertise its products, its use of plaintiff's logo created confusion as to whether it was a franchisee); *see also D56, Inc. v. Berry's Inc.*, 955 F. Supp. 908, 919 (N.D. Ill. 1997) (citing *Sebastian* at 53 F.3d at 1076) (acts such as the use of the producer's trademark on displays and in advertising, and the distribution of the producer's promotional literature constituted conduct that went beyond mere resale and its incidental advertising). This is especially the case where the manufacturer has an authorized network in place and the consumer is misled into believing that the defendant is part of that network. *Bandag*, 720 F.2d at 911.

The record is not yet sufficiently clear for the court to rule on K's motion for summary judgment as to Enesco's Lanham Act claim. Enesco has indicated that discovery has not yet been completed on the issue of whether K's distributes promotional literature that only an authorized dealer would have available for customers. Whether K's use of Enesco's logos in its advertising, coupled with the in-store displays and signage, constitute more than mere reselling and permissible advertisement will need to be addressed in further briefing or

at oral argument on this issue. At that time, the court expects Enesco to present all evidence concerning K's activities, along with the specific cases it relies upon to support its contention that its claim is not barred under the first sale doctrine.

If Enesco is able to convince the court that the first sale doctrine does not bar its Lanham Act claim, it faces the separate hurdle of establishing that K's actions actually caused confusion. K's emphasizes Schimpf's testimony that there is no way to objectively ascertain if a store is an authorized dealer without checking to see if it had a contract with Enesco. According to K's, the fact dealers that display the PM/CT Figurines in a variety of ways means that Enesco cannot prove that K's displays would cause any confusion. That each authorized dealer presents its PM/CT Figurines in a slightly different display may not, however, require the conclusion that K's actions do not create confusion among customers about its status as an authorized dealer. It is uncontested that K's uses PM/CT Figurine trademarks and Enesco's stylized name in its advertisements. K's in-store signage may not have been provided by Enesco, but it is unclear whether a consumer, even a sophisticated one, would be able to discern the difference considering the inclusion of the trademarked version of Enesco's name. It is also uncontested that K's has sold "special status" figurines, purportedly available only to select authorized dealers. K's contends that sophisticated PM/CT Figurine consumers would not believe K's is an authorized dealer because it discounts the price of PM/CT Figurines. If the court is to give those consumers credit for knowing that authorized dealers do not discount, it may also assume they are likely to know that only select authorized dealers receive "special status" figurines.

Enesco's unfair competition claim is arguably bolstered by the testimony of Shirley Hake, the sales assistant for a Hallmark store located near the K's in Fort Wayne, Indiana. Hake testified that many customers believed the K's store was an authorized dealer and one specifically commented that K's must be an authorized dealer because it sold special status figurines. Such conversations are in fact evidence of consumer confusion. "[W]hile likelihood of confusion 'can be proven without any evidence of actual confusion, such evidence, if available, is entitled to substantial weight.'" *International Kennel Club of Chicago v. Mighty Star, Inc.*, 846 F.2d 1079, 1090 (7th Cir. 1988) (quoting *Helene Curtis Indus., Inc. v. Church and Dwight Co.*, 560 F.2d 1325, 1330 (7th Cir. 1977)).

The line between permissible sales techniques and impermissible unfair competition is thin and uncertain. "Summary judgment is not to be used to resolve evidentiary conflicts, but merely to identify their presence or absence." *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 172 (7th Cir. 1996). The evidence cited above indicates that genuine issues of material fact exist as to whether or not K's actions caused consumer confusion.

## CONCLUSION

K's motion for summary judgment (Doc. 27-1) is denied. With respect to the Lanham Act claim, the denial is without prejudice to a renewed motion when both sides agree that discovery is complete.

ENTER:

Dated: August 29, 2000

REBECCA R. PALLMEYER
United States District Judge

29